## IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
## NORTHERN DIVISION

**JAMES LEE WOODS**                                                    **PLAINTIFF**
**ADC #184441**

**V.**                          **NO. 3:24-cv-00115-BSM-ERE**

**DARRELL ELKIN and**
**DEBBIE BURLESON[1]**                                              **DEFENDANTS**

### RECOMMENDED DISPOSITION

### I.    Procedure for Filing Objections

This Recommendation has been sent to United States District Judge Brian S. Miller. You may file written objections to all or part of this Recommendation. Objections must: (1) specifically explain the factual and/or legal basis for the objection; and (2) be received by the Clerk of this Court within fourteen (14) days of the date of this Recommendation. If you do not object, you risk waiving the right to appeal questions of fact.

### II.    Background

*Pro se* plaintiff James Lee Woods, an Arkansas Division of Correction ("ADC") inmate formerly incarcerated at the Lawrence County Detention Center ("Detention Center"), filed this lawsuit under 42 U.S.C. §1983. *Doc. 1*. Mr. Woods'

---

[1] **The Clerk is instructed to update the docket sheet to reflect the correct spelling of this Defendants' name – Debbie Burleson. *Doc. 10*.**

complaint alleges that, while he was incarcerated at the Detention Center[2] from September 2023 until February 2024, Dr. Darrell Elkin and Jail Supervisor Debbie Burleson failed to provide him heart medication and medical treatment, resulting in kidney damage.[3]

Both Defendants have now filed separate motions for summary judgment, briefs in support, and statements of undisputed facts arguing that they are entitled to judgment as a matter of law on Mr. Woods' claims against them. *Docs. 53, 54, 55, 56, 57, 58*. Mr. Woods has responded to Defendants' motions and Defendant Elkin filed a reply. *Docs. 60, 61, 62*. Both motions are now ripe for review.

For the following reasons, I recommend that Defendants' motions (*Docs. 53, 56*) be granted.

## III.    <u>Discussion</u>

### A.    **Summary Judgment Standard**

Summary judgment is appropriate when the record, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine dispute as to

---

[2] Because Mr. Woods did not file separate responses to Defendants' statements of undisputed facts, the material facts in the statements are deemed admitted (*Docs. 55, 58*). See Local Rule 56.1(c) (providing that material facts set forth in the moving party's statement "shall be deemed admitted unless controverted" by the non-moving party's opposing statement).

[3] During his incarceration at the Detention Center, Mr. Woods also occasionally complained of pain in his hip and shoulder, but those complaints are not included in his medical deliberate indifference claims raised in this lawsuit. *Doc. 58-8 at 17*. In addition, during his deposition, Mr. Woods conceded that any alleged failure of Defendants to provide him diabetes medication is not included in the claims raised in this lawsuit. *Id. at 75*.

any material fact, and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 249-50 (1986). The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex*, 477 U.S. at 323. Once that has been done, the nonmoving party must come forward with specific facts demonstrating that there is a material dispute for trial. See FED. R. CIV. P. 56(c); *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). A party is entitled to summary judgment if -- but only if -- the evidence shows that there is no genuine dispute about any fact important to the outcome of the case. See FED. R. CIV. P. 56; *Odom v. Kaizer*, 864 F.3d 920, 921 (8th Cir. 2017).

## B.     Undisputed Factual Evidence[4]

On September 19, 2023, Mr. Woods was booked into the Detention Center. *Doc. 55-3 at 2*; *Doc. 58-2 at 1*. On the same day, he began taking four prescription medications – Eliquis, Glipizide, Pioglitazone, and Gabapentin. *Doc. 58-4 at 19*.

---

[4] Unless otherwise specified, these facts are taken from: (1) Mr. Woods' arrest and booking records (*Doc. 58-2*); (2) Mr. Woods' requests and grievances (*Doc. 58-3*); (3) Mr. Woods' jail medical file (*Doc. 58-4*); (4) Detention Center incident reports (*Doc. 58-5*); and (5) Mr. Woods' medical records (*Doc. 58-9, Doc. 58-10*).

The incident reports, though not in the form of sworn affidavits, are properly considered. The standard for admissibility at the summary judgment stage, "is not whether the evidence would be admissible at trial [but] whether it *could* be presented at trial in an admissible form." *Gannon Int'l, Ltd. v. Blocker*, 684 F.3d 785, 793 (8th Cir. 2012) (citing FED. R. CIV. P. 56(c)(2)) (emphasis in original). By affidavit, Defendant Burleson, the custodian of records for the Detention Center, authenticates the incident reports as records kept in the ordinary course of the Detention Center's business. *Doc. 58-1 at 1*. In addition, Mr. Woods does not argue that the information contained in reports could not be presented in an admissible form at trial.

On September 21, 2023, while Mr. Woods was getting ready to attend a court appearance, he complained of "feeling heavy" and pain in his chest and shoulder. *Doc. 58-5 at 2*. At that time, non-party Sergeant Pickney checked Mr. Woods' blood pressure and oxygen levels. Mr. Woods' blood pressure was 146/80 and his oxygen level was 99%. *Id*.

A couple of hours later, Detention Center staff contacted the doctor (presumably Defendant Elkin) to tell him that Mr. Woods was suffering from chest pains, but the doctor did not answer. *Id*.

Approximately twenty-five minutes later, Detention Center staff transported Mr. Woods to the Lawrence Memorial Hospital based on his complaints of chest pain. *Doc. 58-10 at 2-3*.

Later that day, Detention Center staff released Mr. Woods on medical furlough. *Doc. 55-3 at 2-3*, *Doc. 58-2 at 2*. According to Mr. Woods' arrest and booking records, Detention Center staff advised him that he was being sent to St. Bernards Hospital and that he should return to the Detention Center on September 25, 2023. *Id*.

On September 26, 2023, Mr. Woods called the Detention Center and notified staff members that he had a stent placed in his heart on September 25, 2023, and that he would check back in with updates. *Doc. 58-5 at 2*. According to Mr. Woods'

medical records from St. Bernards, upon his release from the hospital, medical staff prescribed him Aspirin, Clopidogrel, Ezetimibe, and Nitroglycerin. *Doc. 55-3 at 7.*

On September 28, Mr. Woods was booked back into the Detention Center. *Doc. 58-2 at 3.* On the same day, Defendant Elkin examined Mr. Woods and noted that he would review Mr. Woods' medical records from St. Bernards and check his medications. *Doc. 58-4 at 2.*

On September 29, Defendant Elkin again examined Mr. Woods. *Id. at 3.* He noted that Mr. Woods had not had any Xanax for five days and that Mr. Woods' medications should be checked and ordered. *Doc. 55-5 at 1; Doc. 58-4 at 3.* That same day, Mr. Woods began taking Aspirin and Clopidogrel. *Doc. 58-4 at 19.*

On October 8, Defendant Elkin evaluated Mr. Woods, who complained of arthritis in his hip and knee during the encounter. Defendant Elkin made no notations regarding complaints of heart problems or not receiving medication(s). *Doc. 58-4.*

On October 9, around 11:00 p.m., Mr. Woods told Detention Center staff that he felt like he was having a heart attack. *Doc. 58-5 at 4.* Staff members placed Mr. Woods in isolation on medical watch and took his blood pressure, which was 120/90. *Id.* Staff specifically noted that Mr. Woods "had no physical tells that he was experiencing any such pain." *Id.*

On October 24, Mr. Woods submitted a medical request stating that he refused to see Defendant Elkin because "he has already lied to me gave me a different medicin[e] than he said." *Doc. 58-3 at 1; Doc. 55-8 at 1*.

On October 25, Defendant Elkin evaluated Mr. Woods, who complained of shoulder pain as a result of a rotator cuff injury that he previously suffered. *Doc. 58-4*. However, again, Defendant Elkin did not make any notation indicating that Mr. Woods was suffering from any heart problems or chest pains, or that he was in need of any specific medication. *Id*.

On October 26, Detention Center staff contacted St. Bernards "cardio office" in response to Mr. Woods' "referral." *Doc. 58-5 at 5*. St. Bernards medical staff explained that they did not provide any such treatment to inmates and that Detention Center staff would need to contact "Batesville Cardio." *Id*.

On November 7, Defendant Elkin evaluated Mr. Woods, who complained of shoulder pain, but said nothing about heart problems, chest pain, or needing any specific mediation at that time. *Doc. 58-4 at 10*.

On November 8, Detention Center staff transported Mr. Woods to White River Medical Center "as a follow up post PCI at St. Bernards." *Doc. 58-9 at 2*. At that appointment, Mr. Woods complained of shortness of breath, chest pressure at rest, pain under his left shoulder blade, and swollen feet. *Id. at 3*. Dr. Bhaskar Bhardwaj evaluated Mr. Woods and noted that Mr. Woods reported "no lightheadedness, no

6

chest pain, and no palpitations." *Id*. Dr. Bhardwaj prescribed Mr. Woods Amlodipine for chest pain and scheduled a follow-up appointment for Mr. Woods for February 7, 2024. *Id. at 4*.

On November 9, around 1:00 a.m., Mr. Woods complained of "extreme heart problems," but told Detention Center staff that he did not need to be moved to isolation. *Doc. 58-5 at 6*. Around thirty minutes later, Mr. Woods called for Detention Center staff, who helped him to isolation to be placed on medical watch. *Id*. At that time, Mr. Woods told staff that he would be filing a lawsuit for medical malpractice and that he needed to go to the hospital immediately. *Id*. Staff members contacted paramedics to have Mr. Woods vitals checked.

Around 1:50 a.m., paramedics arrived, checked Mr. Woods vitals, and told Detention Center staff that Mr. Woods' vitals "were not acceptable levels and he was likely having an AFIB episode." *Id*. He was released from the Detention Center on medical furlough and taken to the hospital. *Doc. 55-12 at 1*; *Doc. 58-2 at 3, 5*.

On November 12, Mr. Woods was booked back into the Detention Center. *Doc. 58-2 at 6*.

On November 14, medical personnel noted, "Dr. Vance @ SB – spoke Mtn. Valley[.] They don't see inmates[.] Ref to Batesville. Send all paperwork[.] Req. 2 officers[.] 1 to check in[.] 1 to stay[.]" *Doc. 58-4 at 12*.

On November 15, medical staff from White River Health called the Detention Center to ask whether Mr. Woods had been transported to the hospital for medical treatment. *Doc. 58-5 at 6*. Detention Center staff confirmed that Mr. Woods had been admitted to the hospital on November 9, where he received medical treatment until November 11. *Id*. White River Health staff requested Mr. Woods' discharge paperwork and Detention Center staff faxed those documents to them at that time. *Id*.

On November 20, Mr. Woods began taking Fenofibrate 145 milligram once daily. *Doc. 58-4 at 19*.

On November 21, Detention Center staff took Mr. Woods' blood pressure, which read 90/59. *Doc. 58-5 at 6*. Later that day, Mr. Woods submitted a grievance complaining that: (1) he had been hospitalized twice while detained at the Detention Center because medical staff had failed to provide him medication as prescribed; (2) the Detention Center failed to adequately staff medical personnel; and (3) because nurses at the Detention Center had improperly removed his medications from the packaging, he could not ensure that he had been provided the correct medication at the correct times. *Doc. 55-14 at 1; Doc. 58-3 at 3*.

On November 27, Defendant Burleson responded to Mr. Woods' grievance and explained that she had spoken to the nurse who reported explaining to Mr. Woods what medications she was providing him and making sure that he was taking his prescription medication. *Id*.

8

On November 29, Mr. Woods met with Defendant Elkin. *Doc. 58-5 at 7*. At that encounter, Defendant Elkin showed Mr. Woods his prescription medication and explained "everything [Mr. Woods] was on." *Id*. Mr. Woods refused to sign the form acknowledging his prescription medication. *Doc. 55-14 at 2; Doc. 58-5 at 7*.

On December 1, Detention Center staff examined Mr. Woods and noted that his legs were swollen, and he reported having difficulty breathing. *Id*. Detention Center staff took Mr. Woods blood pressure and pulse. *Id*. His blood pressure was 110/63 and his pulse was 66. *Id*. Detention Center staff spoke to Defendant Elkin who told staff to bring Mr. Woods "up front" to watch him and to elevate his legs. *Id*.

On December 2, Mr. Woods submitted a grievance complaining that when he requested medical care he was placed in isolation and denied assistance. *Doc. 58-3 at 4*. On December 4, Defendant Burleson responded, "No sir we put in you in there for medical watch." *Id*.

On December 3,[5] Mr. Woods filed another grievance complaining that he felt like that he had suffered a heart attack, he was out of breath, and his legs, feet, and face were swelling. He explained that medical staff refused to listen to him and requested assistance. *Id. at 5*. On December 4, Defendant Burleson responded, "We have you in ISO cell for medical check, to watch you per the medical staff." *Id*.

---

[5] This is the day before Defendant Burleson responded to Mr. Woods' December 2 grievance.

On December 4, Mr. Woods refused his night-time medication. *Doc. 58-5 at 8.*

On December 5, a nurse examined Mr. Woods and told him how important it was to follow medical staff's instruction to prop up his feet and take his medication. *Id*. She noted that Mr. Woods was "10-4" at that time. *Id*.

The same day, Mr. Woods began taking KlorCon/KCL/potassium 10 milligrams once daily. *Doc. 58-4 at 19*.

On December 6, Defendant Elkin met with Mr. Woods and him that he had to elevate his feet. *Doc. 58-5 at 9*. When Defendant Elkin asked Mr. Woods why he had refused his nightly medication, Mr. Woods stated that he was "mad, so I stopped my meds." *Doc. 55-15 at 1*. Defendant Elkin allowed Mr. Woods to return to general population. *Doc. 58-5 at 9.*

On December 9, Mr. Woods submitted a grievance requesting to be medically furloughed. *Doc. 58-3 at 6*. Detention Center staff did not respond to Mr. Woods grievance.

On December 13, Mr. Woods submitted a medical request complaining of swelling feet and "chest related issues." *Doc. 58-5 at 9*. Detention Center staff placed Mr. Woods on medical watch in isolation and noted that Defendant Elkin had told Mr. Woods "countless times" to elevate his feet, but Mr. Woods refused. *Id*. Around 9:00 p.m., Detention Center staff went to isolation to monitor Mr. Woods. *Id*.

Detention Center staff reported that Mr. Woods was not following Defendant Elkin's instructions, but that he appeared "10-4" at that time." *Id*.

On December 14, after observing Mr. Woods place his hands on his chest, Detention Center staff took Mr. Woods blood pressure and oxygen level. *Id. at 10*. Mr. Woods' blood pressure read 111/65 and his oxygen level was 96% with a pulse of 63. *Id*.

On December 17, Detention Center staff called Defendant Elkin to notify him that Mr. Woods' blood pressure in his left arm was 104/68 with a pulse of 118 and his blood pressure in his right arm was 113/75 with a pulse of 86. *Id*. Defendant Elkin told staff to: (1) hold Mr. Woods' Lisinopril, Sotalol, Amlodipine, and Furosemide; and (2) check Mr. Woods' blood pressure every few hours unless he was symptomatic. Defendant Elkin told staff to call him "ASAP" if Mr. Woods' blood pressure dropped below 100/50. *Id*.

On December 20, Defendant Elkin examined Mr. Woods and noted that: (1) Mr. Woods was scheduled for a cardio appointment in Batesville on December 26; and (2) Mr. Woods' blood pressure was 102/66 with a pulse of 63 in his left arm and his blood pressure was 108/70 in his right arm with a pulse of 65. *Doc. 55-16 at 1*; *Doc. 58-4 at 10, 14*.

That night, around 7:30, Detention Center staff took Mr. Woods' blood pressure. *Doc. 58-5 at 10*. His blood pressure in his left arm was 98/80 and his blood

11

pressure on his right arm was 115/89. *Id.* About an hour later, Defendant Elkin instructed Detention Center staff to transport Mr. Woods to St. Bernards for an evaluation and possible treatment. *Id*.

The next day, December 21, Mr. Woods was released from the Detention Center on medical furlough. *Doc. 55-17 at 1-2*; *Doc. 58-2 at 6-7*.

At St. Bernards, medical staff diagnosed Mr. Woods with atrial fibrillation, acute kidney injury, coronary artery disease, hypertension, hyperlipidemia, and diabetes. *Doc. 55-23 at 2-3. Doc. 55-17 at 3*. Upon discharge, medical staff prescribed Mr. Woods Amiodarone, Furosemide, and Polyethylene Glycol. *Id. at 5*. Mr. Woods' treatment plan was to "monitor renal function" and "continue cardiac meds." *Id. at 5*.

On December 27, Mr. Woods was booked back into the Detention Center and Defendant Elkin took Mr. Woods' blood pressure. *Doc. 58-2 at 8*); *Doc. 55-19 at 1*.

On January 2, 2024, Defendant Elkin again took Mr. Woods' blood pressure. *Id*. The next day, Mr. Woods refused to be seen by Defendant Elkin. *Id***.**

On January 5, during a pod check, Mr. Woods stopped a Detention Center staff member to tell him that he had not been receiving his medication regularly and that he had repeatedly missed doses. *Doc. 58-5 at 11*. Staff told Mr. Woods that he would have to get in touch with his doctor or file a grievance to resolve that issue.

*Id*. Mr. Woods responded that he hated Defendant Elkin and that he feared for his life based on Defendant Elkin's failure to provide him adequate medication. *Id*.

On the same day, Mr. Woods told Detention Center staff that he did not receive his two heart medications "with his baggie." *Id. at 12*. As a result, Detention Center staff filed a "jail incident report" and noted that staff would "keep a[n] eye on inmate in case of medical issue." *Id*.

On January 7, Detention Center staff provided Mr. Woods his medication, but notified him that he had been out of Amiodarone, which is why he had not received that medication over the weekend. *Id*. However, because medical staff had received the medication, the nurse would "make up a new batch." *Id*. According to the incident report, Mr. Woods then began acting erratic and stated that he was "about to go into A-Phib." *Id*. Staff placed Mr. Woods on medical watch in isolation. At that time, Mr. Woods requested to be transported to the hospital. Staff declined to transport Mr. Woods to the hospital and instructed him to take Amiodarone. However, Mr. Woods refused. Mr. Woods then refused to have his vitals taken. *Id. at 13*. Staff advised that they would continue to monitor Mr. Woods. *Id*. Later the same day, Mr. Woods began taking Amiodarone/Cordorone 400 milligram twice daily.

On January 17, Detention Center staff transported Mr. Woods to the White River Medical Center Cardiology Unit for a follow up appointment. *Doc. 58-9 at 5-*

*7*. Mr. Woods' medical records indicate that his lungs were clear and that his cardio was "normal." *Id. at 7*. In addition, Mr. Woods did not complain of any lightheadedness or chest pain. *Id. at 6*. Mr. Woods was instructed to return to the office as needed and that the cardiologist would see Mr. Woods again in six months. *Id. at 7; Doc. 58-4 at 17; Doc. 55-20 at 1*.

On January 21, medical staff changed Mr. Wood's Amiodarone dosage to 200 milligrams, once daily. *Doc. 58-4 at 19*.

In February 2024, Mr. Woods was released from the Detention Center and transferred to the ADC.[6] *Doc. 55-18 at 1; Doc. 58-2 at 8*.

### C.    Mr. Woods' Version of Events[7]

During his deposition, Mr. Woods testified that he began having heart problems in 2009 and was diagnosed with atrial fibrillation at that time. *Doc. 58-8 at 10*. Sometime in 2009, Mr. Woods had a stent placed in his heart and, at some unspecified date, Mr. Woods underwent an ablation. *Id. at 12-14*. Since having the ablation, Mr. Woods explained that he consistently took Sotalol to treat his arrythmia. *Id. at 18*.

---

[6] In his deposition testimony, Mr. Woods testified that he was released to the ADC on February 2, 2024. *Doc. 58-8 at 5*. However, his arrest and booking records indicate that he was released on February 12, 2024. *Doc. 58-2 at 8*. This factual dispute is immaterial to Mr. Woods' pending claims.

[7] Unless otherwise specified, Mr. Woods' version of events is taken from his deposition testimony. *Doc. 58-8*.

According to Mr. Woods, he did not suffer any heart problems until eighteen months before he was incarcerated. *Id. at 26*. At that time, although Mr. Woods had consistently taken his medication, he was hospitalized for two days. Mr. Woods did not know the cause of the "flareup" that caused his hospitalization. *Id. at 27-28*.

Mr. Woods explained that, on the date of his arrest, September 19, 2023, he took his morning medication. *Id. at 48*. After he was arrested, an officer packed Mr. Woods' medication and brought it to the Detention Center's booking area. *Id. at 20*. Although Mr. Woods allegedly repeatedly told Detention Center staff that he needed to take his medication, they failed to provide him medication for the first two days that he was incarcerated at the Detention Center. *Id*. As a result, Mr. Woods explained that he had to be hospitalized and received a stent in the same artery that he had a stent placed in 2009. *Id. at 22*.

After Mr. Woods was discharged from the hospital and returned to the Detention Center, he stated that Detention Center staff provided him Sotalol. *Id. at 29*. However, Mr. Woods testified that, following his September 2023 hospital stay, Detention Center staff failed to provide him medication on six additional occasions which resulted in three additional hospital stays. *Id. at 31-34, 37, 46*.

Mr. Woods alleges that he did not receive his medication for a five-day period in October 2023.[8] *Doc. 58-8 at 54*. Mr. Woods concedes he received his medication

---

[8] It is unclear what specific dates Mr. Woods allegedly failed to receive prescription

while he was medically furloughed from September 21 until September 28. *Id. at 50*. He also acknowledges that Detention Center staff consistently provided him medication until October 12 or October 13,[9] at which time he told non-party officer Modesto that Detention Center staff had failed to provide him medication. *Id.* However, Mr. Woods did not raise this issue in the October 13 grievance. And he presents no evidence of any other grievance alleging denial of medication in October 2023. *Id. at 51-52*; *Doc. 55-6 at 1*.

In his October 24 medical grievance, Mr. Woods complained that, although Dr. Elkin had prescribed him a steroid for pain, he cannot take steroids because he is diabetic, and steroids could elevate his blood sugar. *Id. at 55; Doc. 55-7 at 1*. It is undisputed that Mr. Woods did not raise any complaints regarding his failure to receive prescription medication in his October 24 grievance. *Doc. 55-7 at 1*.

Mr. Woods contends that the next time that he did not receive his prescription medication was on November 9, 2023, the same date he was admitted to the hospital.[10] *Id. at 58*.

---

medication in October 2023.

[9] Mr. Woods also testified that he failed to receive his medication in mid-October. *Doc. 58-8 at 59*. However, it is unclear whether Mr. Woods was referring to a separate time in October or part of the five-day period.

[10] Presumably, that was the third time that Mr. Woods failed to receive his prescription medication.

When asked whether he received his medication consistently between November 12 and December 21, Mr. Woods responded "twice."[11] *Id. at 60*.

Mr. Woods testified that after he was hospitalized from December 21 until December 27, "they let [him] run out [of medication] one more time." *Id. at 63*. Mr. Woods clarified that "they" allowed him to go without medication for two days at an unspecified date.[12] *Id. at 72*.

During Mr. Woods' last stay in the hospital, from December 21 through December 27, 2023 (*Doc. 58-5 at 47-49*), non-party Dr. Chavez changed Mr. Woods' medication to Amiodarone because the Sotalol was no longer working. *Id. at 18, 22*. In addition, Mr. Woods testified that "they took a ton of fluid off of me, which caused me to have acute kidney damage." *Id. at 40*. He states that medical personnel prescribed "Lasix to keep the fluid off of me" and that he was supposed to see a urologist following his discharge from the hospital, but he was never taken to any such appointment.[13] *Id. at 76*. Mr. Woods allegedly began receiving

---

[11] Presumably, those are the fourth and fifth times that Mr. Woods failed to receive his prescription medication.

[12] Presumably, that was the sixth time that Mr. Woods failed to receive his prescription medication and that occurred when Detention Center staff notified Mr. Woods that he had not received his Amiodarone in January 2024. *Doc. 58-5 at 12*.

[13] Mr. Woods does not allege that Dr. Elkin was to blame for Mr. Woods not seeing a urologist promptly after his hospital discharge or that any such delay was responsible for his kidney damage, which he already had before being referred to a urologist.

medication for his kidney condition on or around May 1, 2024, following his February 2024 transfer to ADC custody. *Id. at 64*.

### D.    Medical Deliberate Indifference[14]

### 1.    Standard

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (omitting quotations and citation). At the summary judgment stage, Mr. Woods "must clear a substantial evidentiary threshold" to show that Defendants acted with deliberate indifference. *Johnson v. Leonard*, 929 F.3d 569, 576 (8th Cir. 2019). An inadvertent or negligent failure to provide adequate medical care does not amount to deliberate indifference.[15] *Id. at 575*. Instead, deliberate indifference requires culpability akin to criminal recklessness, which is more blameworthy than negligence but "something less than acts or omissions for the very purpose of causing harm or

---

[14] On Mr. Woods' complaint form, he checked the box indicating that he was a convicted prisoner and provided a conviction date of January 29, 2024. *Doc. 1 at 2*. Because Mr. Woods was both a pre-trial detainee and a convicted prisoner during the relevant time period, his inadequate medical care claims arise both under the Fourteenth Amendment's Due Process Clause and the Eighth Amendment's Cruel and Unusual Punishment Clause. See *Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979). However, the Eighth Circuit has applied the Eighth Amendment's deliberate indifference standard to inadequate medical care claims raised by both convicted inmates and pretrial detainees. See *Whitney v. City of St. Louis, Missouri*, 887 F.3d 857, 860 & n.4 (8th Cir. 2018) (applying deliberate indifference standard to claim that correctional officer failed to monitor and provide adequate medical care to detainee who committed suicide).

[15] Mr. Woods' pleadings appear to assert only federal constitutional claims and those are the only claims addressed. To the extent that Mr. Woods asserts a state-law medical malpractice claim, I recommend that the Court decline to exercise any jurisdiction of any such claim. See also 28 U.S.C. § 1367(c)(3) (district court may, once it has dismissed federal claims on which its original jurisdiction is based, decline to exercise jurisdiction over supplemental state law claims).

with knowledge that harm will result." *Farmer v. Brennan*, 511 U.S. 825, 835 (1994). Stated another way, Defendants can be held liable only if their actions were "so inappropriate as to evidence intentional maltreatment or a refusal to provide essential care." *Dulany*, 132 F.3d at 1240-1241 (citing *Smith v. Jenkins*, 919 F.2d 90, 93 (8th Cir. 1990)). "Merely demonstrating that a prison doctor committed medical malpractice is insufficient to establish deliberate indifference." *Jackson v. Buckman*, 756 F.3d 1060, 1065-1066 (8th Cir. 2014) (internal citation omitted).

### 2. Defendant Elkin's Motion for Summary Judgment

### a. Individual Capacity Claim

Based on the undisputed evidence before the Court, no reasonable juror could conclude that Defendant Elkin was deliberately indifferent to Mr. Woods' medical needs. Mr. Wood has not come forward with any evidence that Defendant Elkin: (1) personally failed to provide him medication; (2) intentionally caused Mr. Wood to miss any medication; or (3) was personally aware that Mr. Woods missed any medication, other than in September 2023, when Mr. Wood's Xanax prescription lapsed and in December 2023 when Mr. Woods refused to take his medication. And Defendant Elkin has presented an affidavit testifying that: (1) although he prescribes medication to Detention Center inmates, he does not dispense medication to inmates; (2) his first encounter with Mr. Wood occurred after his September 2023 hospital stay; (3) during his November 29, 2023 encounter with Mr. Woods, they reviewed

all prescribed medications and Defendant Elkin explained the importance of taking all medication as prescribed; (4) during his December 6, 2023 encounter, Mr. Woods said he stopped taking his medication because he was mad; (5) on January 3, 2024, although Mr. Woods refused to see Defendant Elkin, Defendant Elkin ordered Detention Center staff to stop providing Mr. Woods his heart medication until his blood pressure, which was low, stabilized; and (6) after each of Mr. Woods' hospitalizations, Defendant Elkin reviewed Mr. Woods' discharge instructions to ensure that Detention Center staff was following each doctor's orders. *Doc. 55-1 at 2, 4, 5*. Defendant Elkin also carefully monitored Mr. Woods' blood pressure and oxygen levels and consistently discussed Mr. Woods' course of care with Detention Center staff. Such conduct can hardly be described as criminally reckless.

Even assuming a jury could fault Defendant Elkin for failing to ensure that Mr. Woods received every dose of his prescribed medicine, such conduct fails to rise to a constitutional level. It is well settled that the periodic, negligent failure to properly dispense prescription medications is not deliberate indifference, and thus, insufficient alone to support a constitutional claim. *Zentmyer v. Kendall Cnty. Ill.*, 220 F.3d 805, 811 (7th Cir. 2000); *Erin v. Busby*, 992 F.2d 147, 150-51 (8th Cir. 1993); see also *Dulany v. Carnahan*, 132 F.3d 1234, 1245 (8th Cir. 1997) ("[I]solated incidences of medical malpractice or negligence do not amount to deliberate indifference.").

Finally, Mr. Woods alleges that he suffered acute kidney failure as a result of Defendant Elkin's failure to provide him medication. But Mr. Woods offers no proof that his kidney issues were caused by missed medication or any conduct on the part of Defendant Elkin. Mr. Woods' alleged kidney damage is considered a "sophisticated medical condition" that "could be caused by numerous factors other than lack of medication." *Robinson v. Hager*, 292 F.3d 560, 564 (8th Cir. 2002). As a result, Mr. Woods must present expert testimony to prove that Dr. Elkin's failure to provide him medication caused his kidney failure. *Id.* (ruling on summary judgment that inmate's "failure to produce expert testimony to prove that lapse in medication caused his stroke" was fatal to his medical deliberate indifference claim).

On this record, Mr. Woods has failed to present any evidence to create a dispute of material fact as to whether anything Defendant Ekin did or failed to do harmed Mr. Woods or violated his constitutional rights. In other words, the record evidence is insufficient to permit a reasonable jury to find in Mr. Woods' favor on his claim that Defendant Elkin provided constitutionally inadequate medical care.

Defendant Elkin is entitled to judgment as a matter of law on Mr. Woods' medical deliberate indifference claim against him.

### b.     Official Capacity Claim

To the extent that Mr. Woods asserts an official capacity claim against Defendant Elkin, Defendant Elkin also is entitled to judgment as a matter of law.

21

Official capacity claims require proof that a policy or custom of the employing entity caused the violation of the plaintiff's rights. *Id. at 166* (citing *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 694 (1978)). Mr. Woods has not identified or presented evidence that a Lawrence County policy or custom caused a violation of his constitutional rights. In addition, because there are no triable issues as to Defendant Elkin's individual liability for an underlying constitutional violation, Lawrence County cannot be liable under § 1983. *Brockinton v. City of Sherwood, Ark.*, 503 F.3d 667, 674 (8th Cir. 2007).

### 3. Defendant Burleson's Motion for Summary Judgment

#### a. Individual Capacity – Qualified Immunity

Defendant Burleson asserts qualified immunity, which protects government officials from personal liability for damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person [in their positions] would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To overcome the defense at the summary judgment stage, a plaintiff must show: "(1) the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) the right was clearly established at the time of the deprivation." *Howard v. Kansas City Police Dep't*, 570 F.3d 984, 988 (8th Cir. 2009).

In his deposition, Mr. Woods explained that his medical deliberate indifference claim against Defendant Burleson is based on her role as superintendent of the jail and as supervisor of the doctor and nurse. *Doc. 58-8 at 58*. However, Defendant Burleson may not be found liable based solely on her supervisory position at the Detention Center. Well-established law holds that a supervisor may not be held vicariously liable under § 1983 for the constitutional violations of a subordinate. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (holding that "vicarious liability is inapplicable to . . . § 1983 suits"); *Saylor v. Nebraska*, 812 F.3d 637, 644-45 (8th Cir. 2016) (because a supervisor cannot be held vicariously liable for the constitutional violations of a subordinate, prisoner must "show that the supervisor personally participated in or had direct responsibility for the alleged violations" or "that the supervisor actually knew of, and was deliberately indifferent to or tacitly authorized, the unconstitutional acts"). Mr. Woods fails to come forward with any evidence that Defendant Burleson was personally responsible for providing him medication or that she intentionally failed to provide him medication. Mr. Woods acknowledged that he never spoke to Defendant Burleson about his medical care. *Doc. 58-8 at 62-63*. In addition, after Mr. Woods submitted his grievance on November 21 complaining about the Detention Center staff's failure to provide him medication, Defendant Burleson spoke to the nurse to ensure that Mr. Woods was receiving the proper medication. *Doc. 55-14 at 1; Doc. 58-3 at 3*. There is no evidence suggesting that

Defendant Burleson did anything to interfere with Mr. Wood's medical care of that could possibly rise to the level of criminal recklessness or the intentional failure to provide essential care.

On this record, no reasonable juror could conclude that Defendant Burleson was deliberately indifferent to Mr. Woods' medical needs. Defendant Burleson is entitled to qualified immunity on Mr. Woods' individual capacity claims.

### b.   Official Capacity Claims

In his deposition, Mr. Woods conceded that his claims against Defendant Burleson are in her personal capacity only. *Doc. 58-8 at 68*. Accordingly, his official capacity claims against Defendant Burleson should be dismissed on that basis.

In addition, as discussed above, Mr. Woods has not identified or presented evidence of a policy or custom of a Lawrence County that caused a violation of his constitutional rights. In addition, because there are no triable issues as to Defendant Burleson's individual liability for an underlying constitutional violation, Lawrence County cannot be liable under § 1983. *Brockinton v. City of Sherwood, Ark*., 503 F.3d 667, 674 (8th Cir. 2007). Defendant Burleson is therefore entitled to summary judgment on Mr. Woods' official capacity claims.

## IV.   <u>Conclusion</u>

IT IS THEREFORE RECOMMENDED THAT:

1.    Defendants' motions for summary judgment (*Docs. 53, 56*) be GRANTED.

2.    Mr. Woods' claims against Defendants Elkin and Burleson be DISMISSED, with prejudice.

3.    Judgment be entered in favor of Defendant Elkin and Burleson.

4.    The Clerk be instructed to close this case.

DATED 13 November 2025.

_____
UNITED STATES MAGISTRATE JUDGE